UNITED STATES of America, Plaintiff,

v.

CITY OF NORTH ADAMS, MA, Defendant.

Civ. A. No. 89–30048–F.

United States District Court, D. Massachusetts.

Aug. 7, 1991.

George Bunsen Henderson, U.S. Attorney's Office, Boston, Mass., for plaintiff.

Robert C. Ware, Freedman, DeRosa & Rondeau, North Adams, Mass., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Before the Court are objections by defendant City of North Adams ("North Adams" or "the City") to recommendations of Magistrate Judge Michael A. Ponsor ("Magistrate Judge"). The Magistrate Judge recommended that the Court grant the government's motion for partial summary judgment, and deny the City's motion for summary judgment. *United States of America v. City of North Adams, Massachusetts,* Civ. Action No. 89–30048–F, Report and Recommendation (March 28, 1991) ("Magistrate Judge's Report"). The government opposes North Adams' objections, and urges the Court to adopt the Magistrate Judge's recommendations. For the reasons stated below, the Court adopts the Magistrate Judge's Report in its entirety.

### II. STANDARD OF REVIEW

█ Because the motions at issue are for summary judgment, the Magistrate Judge's recommendations are subject to *de novo* review by the district court. *See* 28 U.S.C. § 636(b)(1). Section 636(b)(1) provides that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." In making a *de novo* review, the district court must evaluate the record of the proceeding below with sufficient detail to make its own determination with regard to each disputed finding. *United States v. Raddatz,* 447 U.S. 667, 675, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980), *citing* H.R.Rep. No. 94–1609 at 3 (1976), U.S.Code Cong. & Admin.News 1976, at 6162–6163; *Gioiosa v. United States,* 684 F.2d 176, 178 (1st Cir. 1982) (collecting cases). However, the district court need not hold an additional hearing or consider new testimony. *Raddatz,* 447 U.S. at 674–76, 100 S.Ct. at 2411–2413.

### III. DISCUSSION

#### A. Prior Proceedings

In this action, the United States of America alleges that North Adams has violated the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.* ("SDWA"), and regulations promulgated under the SDWA by the Administrator of the Environmental Protection Agency ("EPA"). The complaint charges that the amount of contaminants in the drinking water supplied by North Adams exceeded and continues to exceed the maximum contaminant levels allowed under the relevant federal regulations. 40 C.F.R. §§ 141.13 and 141.14. The complaint further alleges that North Adams failed to monitor the drinking water that it supplied to North Adams residents. 40 C.F.R. § 141.21. The government seeks an injunction to compel North Adams' compliance with federal drinking water standards, and an award of civil penalties.

The parties have not objected to the Magistrate Judge's thorough synopsis of the procedural history of the case; therefore, the Court adopts the Magistrate Judge's summary as contained in his Report and Recommendation as follows.

The United States filed the instant complaint on March 6, 1989. At that time, a parallel proceeding brought by the Massachusetts Department of Environmental Quality Engineering ("the DEQE") against North Adams had been pending in state court for almost two years. Because questions concerning the relative timing and efficacy of these actions are intertwined with the merits of defendant's motion for summary judgment, the court will set forth the salient

procedural facts regarding both lawsuits in some detail.[1]

On April 29, 1987 the DEQE filed a civil action against the City of North Adams in Superior Court, Suffolk County, Massachusetts, captioned *Department of Environmental Quality Engineering v. City of North Adams and Genesio Breda,* Docket No. 87–2322. Pursuant to Mass.Gen.Laws ch. 111, § 160, codified at 310 C.M.R. §§ 22.00 *et seq.,* the DEQE's complaint alleged violations of the state's drinking water statute. More specifically, the state charged the City with repeated violations of the state turbidity MCL [maximum contaminant levels] regulation, 310 C.M.R. 22.-08(1). This state primary drinking water standard is substantially similar to the federal MCL regulating turbidity levels that is at issue in this federal enforcement action.[ ]

However, the parallel state court suit differs from the federal suit in several key respects. First, the state's complaint did not contain a claim for violations of the state's coliform bacteria MCL regulation, 310 C.M.R. 22.05(5). *Nor* did the DEQE seek injunctive relief for an "imminent and substantial endangerment" of the population served by the North Adams public water system, as the Government does in this case.

Indeed, the only relief initially sought by the state consisted of an injunction ordering the City to construct remedial water filtration facilities. Significantly, no interim relief was requested by the DEQE to protect North Adams consumers prior to the construction of an adequate water filtration plant.

Discovery ensued during 1987, after which the Commonwealth filed an amended complaint alleging continuing turbidity violations. DEQE then moved for summary judgment with respect to liability on both the pre- and post-September 23, 1987 violations. None of these motions had been ruled upon when the Government filed this complaint in United States District Court in March 1989.

Later that month, the City invoked the *Colorado River* abstention doctrine in an effort to persuade this court to exercise its discretionary power to dismiss or stay the federal enforcement action in light of the parallel action in state court. In its Report and Recommendation of January 17, 1990, this court urged the district court to decline to do so, concluding that "both the factual record and the procedural history of the pending state-court litigation" created substantial doubt that the state suit could pass muster as an " 'adequate vehicle for the complete and prompt' resolution of the issues raised by the parallel federal action." Report and Recommendation ("R & R") at 14 [*United States v. City of North Adams, Massachusetts,* Civ.Action No. 89–30048–F, Report and Recommendation at 14 (January 17, 1990)].

The following factors were among those which weighed most heavily in the court's determination that neither a dismissal nor a stay was appropriate: 1) the enlarged scope of liability as well as the more comprehensive nature of the relief at issue in the federal action, R & R at 5–6 and 7–8; 2) the fact that none of the pending state court motions had been ruled upon as late as September 13, 1989, the date on which the parties to the federal dispute engaged in oral argument on Defendant's Motion to Dismiss or Stay, *id.* at 6; and 3) the fact that settlement negotiations between the City and the Commonwealth regarding the state court action, conducted from December 1987 through May 1988, had not produced any judicially enforceable results. *Id.* at 6–7.[2]

---

**1.** The account which follows is identical to the procedural history that appears in th[e Magistrate Judge's] January 17, 1990 Report and Recommendation Regarding Defendant's Motion to Dismiss or Stay, except that it has been updated to include subsequent developments substantiated by the expanded record now before th[e Magistrate Judge].

**2.** A judge of the Suffolk Superior Court did meet with counsel for the City and representatives of the DEQE and the EPA on January 8, 1988. At that meeting the parties to the state suit had

On June 7, 1990 Chief Judge Freedman issued a Memorandum and Order adopting the Report and Recommendation in its entirety and denying defendant's motion to dismiss or stay this enforcement action.

Although the City and the DEQE finally arrived at a negotiated settlement of the state civil action in August 1990, a consent decree embodying this settlement was not docketed in state court until after defendant filed its motion for summary judgment here. *See* Ware Aff. at ¶ 6 and Order dated October 11, 1990, attached as an exhibit to Supplement to Defendant's Motion for Summary Judgment (Docket # 30).

This consent decree requires the City to construct a water filtration plant capable of beginning operation on January 31, 1994. Order at ¶ 3. The decree also provides that the City must notify the DEQE and the Attorney General in the event of any delays, *id.* at ¶ 4, but that extension of deadlines may be obtained by the written stipulation of the parties. *Id.* Should the City fail to meet the terms of the decree, the Order also provides for a sliding scale of penalties, based upon the length of the period of non-compliance, which ranges from a minimum of $25 per day to a maximum of $100 per day.[3] *Id.* at ¶ 6. Significantly, the decree also provides that the Commonwealth will not seek penalties for the past and future violations alleged in its complaint as long as the City remains in compliance with the terms of the order. *Id.* at ¶ 8.

Magistrate Judge's Report at 2–6.

Subsequent to execution of the consent decree in Superior Court, the parties filed cross-motions for summary judgment in the federal case. The City moves for summary judgment on the entire complaint, whereas the government seeks partial summary judgment. That is, the government seeks judgment on its claims that the City has violated the SDWA because the City's water has contained amounts of turbidity and coliform bacteria in excess of those allowed by federal regulations. The government further avers that the City failed to monitor the water as required under the regulations. Upon consideration of the motions, the Magistrate Judge advised this Court to deny the City's motion and grant the government's motion. Dissatisfied with the Magistrate Judge's recommendation, the City objected pursuant to 28 U.S.C. § 636(b)(1).

## B. North Adams' Objections

The City has made twenty-seven specific objections to the Magistrate Judge's Report. Defendant City of North Adams' Objection to the Magistrate's Report and Recommendation at 1–5 (April 12, 1991) ("Defendant's Objections"). While the Court finds none of the objections persuasive, the Court finds that, when considered as a whole, the objections raise four general points that require discussion.[4] The Court will discuss these points in turn.

---

3.

| Period of Failure to Comply | Penalty Per Day |
| --- | --- |
| 1st—14th day | $25.00 |
| 15th—21st day | $50.00 |
| each day thereafter | $100.00 |

The decree also sets forth the procedures governing the City's right to dispute a determination of non-compliance. Order at ¶ 6. negotiated a timetable for construction of a water filtration plant by the City. *See* Exhibit A to Defendant's Motion for Summary Judgment in the case at bar, Affidavit of Attorney Robert C. Ware ("Ware") at ¶ 4. Attorney Ware further avers that since that date, the City has been acting pursuant to the negotiated schedule. *Id.* at ¶ 5.

4. Many of the City's objections come without citations to the Magistrate Judge's Report, without citations to supporting authorities, and without justification or supporting argument of any kind. While the Court has considered each of the City's arguments, the Court will not provide extensive discussion with regard to conclusory and unsupported objections. *See Crooker v. Van Higgins,* 682 F.Supp. 1274, 1282 (D.Mass. 1988) (Freedman, C.J.) ("Broad yet unsupported objections will not be permitted and failure to make specific and documented objections may foreclose de novo review.").

### 1. Summary Judgment Standard

The City argues that the Magistrate Judge improperly placed upon it the burden of establishing that genuine issues of material fact exist in the case. The Court finds, however, that the Magistrate Judge properly identified and implemented the summary judgment standards.

█ The Court must grant a motion for summary judgment if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence of record must be considered in a light most favorable to the non-moving party, with all reasonable inferences drawn in his favor. *J.I. Corp. v. Federal Insurance Co.*, 920 F.2d 118 (1st Cir.1990). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position. Having done so, the burden shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the opponent." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990) (citations omitted).

█ However, the Court will not deny summary judgment merely because the nonmoving party has alleged that some facts are in dispute. Rather, upon a motion for summary judgment, the nonmovant has an obligation to "adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

█ The authorities make clear that upon consideration of the government's motion for summary judgment, North Adams has the burden of controverting the relevant facts alleged by the government. Should the City, as the nonmovant, fail to bear this burden, summary judgment must enter in favor of the government. The Magistrate Judge found that the City's pleadings, affidavits, and other documents did not create genuine, material factual disputes with regard to the levels of contamination in North Adams' drinking water or North Adams' alleged monitoring violations, and the Court agrees. The documents and allegations offered by the City do not refute the government's evidence of past and continuing violations of the SDWA and attendant regulations. Thus, the Magistrate Judge made no error in articulation or application of the summary judgment standard.

### 2. Whether North Adams has Violated Federal Turbidity Standards

While North Adams makes numerous arguments with regard to the alleged turbidity violations, the Court finds none of them persuasive. The Court will discuss North Adams' three most fervent arguments *seriatim*.

█ First, the City contends that the regulations promulgated under the SDWA require only that the turbidity levels in the entire system must average less than the maximum contaminant level as set by 40 C.F.R. § 141.13.[5] That is, the City argues that when measuring turbidity for purposes of determining compliance with federal maximum contaminant levels, the Court must consider the average turbidity

---

5. Title 40 C.F.R. § 141.13 provides in its entirety as follows:

   **Maximum contaminant levels for turbidity.** The maximum contaminant levels for turbidity are applicable to both community water systems and non-community water systems using surface water sources in whole or in part. The maximum contaminant levels for turbidity in drinking water, measured at a representative entry point(s) to the distribution system, are:

   (a) One turbidity unit (TU), as determined by a monthly average pursuant to § 141.22, except that five or fewer turbidity units may be allowed if the supplier of water can demonstrate to the State that the higher turbidity does not do any of the following:

   (1) Interfere with disinfection;

   (2) Prevent maintenance of an effective disinfectant agent throughout the distribution system; or

   (3) Interfere with microbiological determinations.

   (b) Five turbidity units based on an average for two consecutive days pursuant to § 141.-22.

in the water system as a whole, not merely the turbidity as determined at one or two discrete water sources. The Court, however, agrees with the Magistrate Judge and the government that the language of 40 C.F.R. §§ 141.2 and 141.13 requires that the samples taken at the points of entry determine compliance *vel non* with federal water standards.

Title 40 C.F.R. § 141.13 provides in relevant part that the maximum contaminant levels for turbidity in drinking water must be "measured at a representative entry point(s) to the distribution system...." Similarly, 40 C.F.R. § 141.2 provides that with particular regard to turbidity (as opposed to other kinds of water contaminants), "the maximum permissible level is measured at the point of entry to the distribution system...." Thus, the express language of the applicable regulations direct that the water samples must be measured at one or more representative entry points, and that that measure will determine compliance with the maximum allowable turbidity standards. The regulations do not say that turbidity levels from all entry points must be averaged to determine the average system turbidity. Such a holding would appear contrary to the express language of the regulation, and is contrary to the EPA's interpretation of the regulation.[6] The Court agrees with the government that sections 141.2 and 141.13 decisively establish that turbidity violations are determined by the amount of turbidity at representative points of entry, not throughout the system as a whole. *See* Reply of United States to Defendant's Opposition to Motion for Partial Summary Judgment at 2 (November 15, 1990) ("Government's Reply"). Simply put, the language of these provisions does not comport with North Adams' interpretation.

Moreover, the Court finds highly relevant the fact that each of the three water sources for the North Adams system serve different water users. Were the Court to adopt North Adams' position, the City could, within the bounds of the regulations, supply water with turbidity in excess of one turbidity unit ("TU") to many users, as long as the water to other users remained clean enough keep the average turbidity in the entire system below one TU. The Court will not interpret the regulations in such a manner absent express language to that effect.

Second, the City contends that section 141.13 is ambiguous in that it does not impose one inflexible standard. The City argues that "[s]ection 141.13 states that the maximum contaminant levels 'are' and then goes on to impose three different possible standards, one turbidity unit determined by a monthly average, five turbidity units determined by a monthly average under certain conditions and five turbidity units based on an average of two consecutive days." Defendant's Objections at 14–15. Thus, the City argues that because section 141.13 is ambiguous, summary judgment is inappropriate, and the Court must reserve for trial the question of whether any violation of that section has occurred.

The Court finds the City's argument unavailing. The language of section 141.13 establishes standards for both long-term and short-term measurements of turbidity. In essence, section 141.13 requires that water turbidity never exceed the average of five TU's over two days, or one TU over a month, as measured at system entry points. The unrefuted evidence offered by the government establishes violation of this plain regulation, and the Court hereby adopts the government's position on this issue.

Third, the City argues that the Magistrate Judge mistakenly placed on it the burden of showing it is entitled to an exemption from section 141.13's one TU average monthly turbidity standard. In essence, the City argues that it can prove, in accordance with the language of section 141.13, that it is subject to the "five or

---

6. The EPA's interpretation of a statutory scheme is due substantial deference. *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 91 (1st Cir.1990) (CERCLA); *Halogenated Solvents Industry Alliance v. Thomas*, 783 F.2d 1262, 1265 (5th Cir.1986) (SDWA).

fewer" turbidity standard, and is thus in compliance with section 141.13.

Section 141.13(a) provides that the maximum contaminant level for turbidity is one TU, "except that five or fewer turbidity units may be allowed if the supplier of water can demonstrate to the State that the higher turbidity does not" interfere with disinfection or microbiological determinations. The City asserts that the government has the obligation to prove that the City cannot avail itself of the "five or fewer" TU standard, that the government has failed to so prove, and that summary judgment in the government's favor is therefore inappropriate.

The government, on the other hand, argues that section 141.13 places upon the City the burden of proving to the appropriate state agency, that is, the Massachusetts Department of Environmental Protection ("DEP" or "DEQE"),[7] that it is entitled to an exemption from the ordinary one TU standard. Section 141.13(a) clearly requires that the water system must demonstrate to the State that the higher standard should apply. Similarly, 40 C.F.R. § 141.4 provides that a variance or exemption from the one TU standard may be granted only "by the entity with primary enforcement responsibility." The government and the City agree that the City never received an exemption, exception or variance from the DEP, and indeed, the City concedes that it never even applied for one. Thus, the government contends that because the City has not proven to the DEP that it is entitled to an exemption from the one TU standard, the "five or fewer" turbidity standard does not apply to the City, and the Court should determine the City's compliance, based on the evidence of record, according to the one TU standard.

■ It is undisputed that the City has not proven to the DEP that it is entitled to the "five or fewer" turbidity standard. The City has failed to obtain the DEP's approval for a higher turbidity level, and the City has offered no evidence indicating

that the DEP would, in any event, consider allowing North Adams to operate under a higher standard. Indeed, the City engineer, Genesio Breda, stated that DEP officials have steadfastly refused to permit the City to operate under any standard higher than the one TU standard. Affidavit of Genesio Breda at 2 (December 16, 1987). Rather, the DEP has taken the position that the City is in violation of the SDWA whenever turbidity levels exceed one TU. *Id.* In sum, while it is clear that DEP has not approved the "five or fewer" standard for turbidity, the City has produced no evidence to support its contention that the "five or fewer" standard could apply. In the absence of such evidence, the Court must hold that the City is subject to the one TU standard as established in section 141.13(a), and that the higher "five or fewer" standard does not apply. Such a holding is consistent with the language of the regulations, which put the burden of proving entitlement on the water system, and requires that proof be made to the State, which, in its discretion, "may" allow for higher levels of turbidity.

In short, finding none of North Adams' arguments persuasive, the Court hereby adopts the recommendations of the Magistrate Judge with regard to turbidity violations. The Court grants summary judgment in favor of the government on the turbidity issue.

3. Whether the United States may Prosecute this Action despite the existence of the Superior Court Action and Consent Decree

■ Without citing any authority for its position, North Adams objects that the Superior Court action, and the existence of the state-monitored consent decree, precludes the government from bringing the instant action. Defendant's Objections at 3, 5. The government, however, contends that section 1414 of the SDWA, 42 U.S.C. § 300g–3, permits the instant action notwithstanding the DEP's initiation and

7. On August 7, 1990, the Massachusetts legislature changed the name of the Department of Environmental Quality Engineering to the De-

partment of Environmental Protection. 1990 Mass.Acts ch. 177.

prosecution of the parallel action in Superior Court. The Court finds that the government is correct, and that the City's position is incorrect as a matter of law.

Section 300g–3 provides in relevant part as follows:

**(b) Judicial determinations in appropriate Federal district courts; civil penalties; separate violations.** The Administrator may bring a civil action in the appropriate United States district court to require compliance with a national primary drinking water regulation ... if—

(1) authorized under paragraph (1) of subsection (a) [of section 300g–3]. . . .

Section 300g–3(a)(1) provides that

(A) Whenever the Administrator finds during a period during which a State has primary enforcement responsibility for public water systems ... that any public water system—

(i) ... does not comply with any national primary drinking water regulation in effect ...

he shall so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance. . . .

(B) If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action, the Administrator shall issue an order ... requiring the public water system to comply with such regulation ... or the Administrator shall commence a civil action under subsection (b).

The Court interprets these provisions to mean that while the State has primary enforcement responsibility, the federal government, if it finds that a public water system does not comply with federal drinking water regulations, will so notify the State and the public water system, and will provide whatever assistance is necessary to bring that public water system into compliance with the federal standards. However, should the State fail to commence an appropriate action to compel compliance with the federal standards within thirty days of the notice, and should the public water system

continue its non-compliance, the government may commence its own civil action, and may seek whatever remedies it deems necessary and allowable under the SDWA. The thirty day time limit does not operate to preclude an action by either the government or the DEP. Rather, it is a thirty day waiting period during which the entity with primary responsibility for enforcement of the SDWA has an exclusive opportunity to bring public water systems into compliance with federal standards. The government need not bring its action within any particular time frame; the statute provides no period of limitations.

■ The parties agree, and the Court so finds, that the DEP did not commence an action until well over thirty days after the EPA notified the State and North Adams of the City's non-compliance. The Court now holds that, in keeping with the explicit language of the statute, the government's action is not precluded by the parallel suit filed by DEP in Superior Court.

Furthermore, the action taken by the DEP, even if it had been filed within thirty days of the EPA notice, was not an "appropriate enforcement action" within the meaning of section 300g–3. The instant federal action seeks different and more extensive relief than the Superior Court action. The federal action seeks short term injunctive remedies in addition to civil penalties, neither of which are at issue in the state proceeding. *See Brewer v. City of Bristol,* 577 F.Supp. 519, 527 (E.D.Tenn. 1983) (where federal public interest suit seeks relief greater than and in addition to monetary and injunctive relief sought in state action, the federal action is not precluded under section 300g–3). Thus, the state court action does not preclude the federal action both because the DEP did not take action within thirty days and because the state action is not an appropriate enforcement action within the meaning of section 300g–3.

4. Whether North Adams has Violated Federal Coliform Bacteria Standards and Monitoring Provisions

The government's complaint charges that North Adams' water supply contained lev-

els of coliform bacteria in excess of those permitted under 40 C.F.R. § 141.14(a) in at least five different months, and that North Adams failed to abide by the coliform monitoring provisions of 40 C.F.R. § 141.21(d). In considering the government's motion for partial summary judgment, the Magistrate Judge relied heavily on the records of water samples kept by the City, and on affidavits of EPA official J. Kevin Reilly. The Magistrate Judge recommended that the Court grant the government's motion for summary judgment with regard to both the coliform bacteria levels and coliform monitoring violations. The City has objected to these recommendations.

With regard to the coliform bacteria levels, the City first argues that Reilly lacks necessary qualifications, and that his mathematical calculations lack the proper evidentiary basis. Second, the City argues that even if the Court should accept Reilly's qualifications and calculations, Reilly's data is flawed because his affidavits do not properly distinguish between routine and check samples.[8]

The Court finds the City's first argument meritless. Reilly's affidavits simply state the number of water samples taken, when taken, and the amount of coliform bacteria per 100 milliliters contained therein. Reilly does not perform any difficult or unusual mathematical calculations. His methodologies do not require further explanation at trial. Rather, Reilly interprets the data collected by and for the City,[9] and states his findings for the Court. Most important, the City has not disputed Reilly's methods of calculation, and, as noted above, cannot contest the validity of the data.

With regard to the City's contention that the government should not use check sample data in determining compliance with the regulations, the government argues, and the Magistrate Judge found, that no matter which samples are included in the section 141.14 calculus, the coliform violations are still established. The evidence and arguments proffered by the government convinces the Court that this is true.

Reilly calculated the amount of coliform bacteria in three different ways. First, he considered all of the samples in his calculation. *See* Affidavit of J. Kevin Reilly (September 27, 1990). Then, he considered all samples except those designated by the City as "check samples" on the water

---

**8.** Title 40 C.F.R. § 141.14 requires that the public water system take routine samples of its water in order to determine whether the amount of coliform bacteria in the water exceeds the maximum contaminant levels allowed under federal regulations. Section 141.14(a)(3) provides that water supplies shall not contain more than "[f]our [coliform bacteria] per 100 milliliters in more than five percent of the samples when 20 or more are examined per month."

Should the routine samples indicate that the water contains coliform bacteria in excess of that allowed by section 141.14, however, the procedures detailed in 40 C.F.R. § 141.21(d) become applicable. Section 141.21(d)(1) provides that "[w]hen the coliform bacteria in a single sample exceed four per 100 milliliters (§ 141.-14(a)), at least two consecutive daily check samples shall be collected and examined from the same sampling point." Any violations confirmed by the check samples must be reported to the State within 48 hours.

Thus, the regulations require the City to take check samples in the event that coliform bacteria levels exceed four per 100 milliliters. However, the regulations further provide that the check samples shall not be used to determine compliance with the maximum contami-

nant levels for coliform bacteria as established in section 141.14. 40 C.F.R. § 141.21(d)(4). Such compliance will be determined from "all coliform bacterial analyses performed ... *except* those obtained from check samples and special purpose samples...." *Id.* (emphasis added).

**9.** The regulations impose on the City a duty to take water samples, compile and record data regarding water quality, and report any violations of federal water samples. *See* 40 C.F.R. §§ 141.21, 141.33(a)(2) and 141.31. Thus, the Court will not entertain the City's arguments that Reilly's data is insufficient to establish coliform bacteria violations when the City itself had the obligation to record the very data necessary to make those determinations. Furthermore, any contention that the handwritten alterations of the records change the sufficiency or reliability of the water records is without merit. The City has produced no evidence that would refute the credibility of the records, and indeed, the City has stipulated to the authenticity of the water records, including those records that contain handwritten alterations. *See* Defendant's Response to Requests for Admissions ¶ 87–106 (September 9, 1989) (attached as exhibit B to Stipulations (September 13, 1989)).

records. Second Affidavit of J. Kevin Reilly Regarding Coliform Bacteria Violations (November 13, 1990). Lastly, he disregarded any handwritten alterations. *Id.* at ¶ 30. Under all of these approaches, Reilly's figures indicate that violations of section 141.14 occurred, and the City has offered no calculations or evidence to the contrary. Thus, the Court expressly adopts the Magistrate Judge's findings in this regard, and holds that North Adams violated section 141.14 for the months of October and August of 1986 and November, October and July of 1985. *See* Magistrate Judge's Report at 37–38.

■ Similarly, the Court finds that North Adams violated the coliform bacteria monitoring requirements of the Act and regulations. The government brought the instant action in response to alleged violations of the SDWA and regulations promulgated thereunder. The government may recover civil penalties for violations of SDWA regulations pursuant to 42 U.S.C. § 300g–3(b), which provides that the Court may impose civil penalties "if ... there has been a violation of the regulation ... with respect to which the action was brought...."

Title 42 U.S.C. § 300f(1)(D) empowers the EPA to adopt "criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including quality control and testing procedures to insure compliance...." Pursuant to this provision, the EPA promulgated 40 C.F.R. § 141.-21(d)(1), which provides for water sample procedures in the event that the coliform bacteria in a single routine sample exceed four per 100 milliliters.

■ The government has provided evidence that North Adams violated these monitoring requirements on numerous occasions throughout 1985 and 1986, and North Adams does not dispute this allegation. Rather, the City argues that the EPA lacks the power to promulgate these regulations, or to recover civil penalties pursuant to them. The Court, however, agrees with the Magistrate Judge, and finds that the language of the SDWA quoted above belies the City's assertion. Sections 300f and 300g–3(b) provide the EPA with the authority to enact monitoring requirements, and to seek civil penalties against water systems that fail to comply. Furthermore, the Magistrate Judge's research has revealed, and the Court is so persuaded, that at least three other district courts from around the nation have held that failure to comply with the monitoring provisions imposed by the regulations can result in civil penalties. *See* Magistrate Judge's Report at 39–40, *citing United States v. Boca Chica Water Supply, Inc.,* 1989 EPA Consent Lexis 7 (S.D.Tex. July 12, 1989); *United States v. Town of Bolton, Mississippi,* 1989 EPA Consent Lexis 45 (S.D.Miss. March 15, 1989); *United States v. Alder Creek Water Co.,* Civ. Action No. 79–1090–JU (D.Or. April 26, 1984). Thus, the Court finds that the government is entitled to summary judgment with regard to its claim that North Adams violated the monitoring provisions of the regulations.

## IV. CONCLUSION

For the reasons stated above, the Court ADOPTS the Magistrate Judge's Report in its entirety. Accordingly, defendant's objections to the Magistrate Judge's Report are OVERRULED, and defendant's motion for summary judgment is DENIED. The government's motion for partial summary judgment is GRANTED.

It is So Ordered.

## REPORT AND RECOMMENDATION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT[1]

March 28, 1991

MICHAEL A. PONSOR, United States Magistrate Judge.

## I. INTRODUCTION

This is an enforcement action brought by the United States ("the Government")

1. This matter has been referred to the court for report and recommendation pursuant to Rule 3

against the City of North Adams, Massachusetts ("North Adams" or "the City") pursuant to 42 U.S.C. §§ 300f—300j–11 of the Safe Drinking Water Act ("SDWA" or "the Act"). The Act authorizes the Environmental Protection Agency ("the EPA") to promulgate mandatory national water quality standards for public water supplies based on public health concerns as well as public welfare-based and aesthetic standards.[2] Invoking §§ 1414(b) and 1431 of the Act, the United States seeks both civil penalties (first claim for relief) and injunctive relief (second claim for relief) against the City for continuing violations of three of the national primary drinking water regulation promulgated under § 1412 of the SDWA. Specifically, the Government alleges that between August 1978 and May 1990 North Adams repeatedly violated federal and state regulations setting forth maximum contaminant levels ("MCLs")[3] for turbidity[4] and for coliform bacteria[5] as well as the Act's monitoring requirements with respect to coliform bacteria.[6]

Currently before this court are the parties' cross-motions for summary judgment. For the reasons set forth below, the court will recommend that North Adams' motion be denied and that the Government's motion for partial summary judgment with respect to liability on its first claim for relief be allowed.

of the Rules for United States Magistrates in the United State District Court for the District of Massachusetts, 28 U.S.C. § 636(b)(1)(B).

**2.** *See* Note, *The Protection of Groundwater and Public Drinking Supplies: Recent Trends in Litigation and Legislation,* 42 Vand.L.Rev. 1649, 1658 (1989).

**3.** At 40 C.F.R. § 141.2 the term "maximum contaminant level" is defined as "the maximum permissible level of a contaminant in water which is delivered to the free flowing outlet of the ultimate user of a public water system, except in the case of turbidity where the maximum permissible level is measured at the point of entry to the distribution system."

**4.** Turbidity measures particulate matter in water. The federal MCL for turbidity are codified at 40 C.F.R. § 141.13.

**5.** Coliform bacteria is an indicator of certain types of microbiological contaminants in water.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural History.

The United States filed the instant complaint on March 6, 1989. At that time, a parallel proceeding brought by the Massachusetts Department of Environmental Quality Engineering ("the DEQE") against North Adams had been pending in state court for almost two years. Because questions concerning the relative timing and efficacy of these actions are intertwined with the merits of defendant's motion for summary judgment, the court will set forth the salient procedural facts regarding both lawsuits in some detail.[7]

On April 29, 1987 the DEQE filed a civil action against the City of North Adams in Superior Court, Suffolk County, Massachusetts, captioned *Department of Environmental Quality Engineering v. City of North Adams and Genesio Breda,* Docket No. 87–2322. Pursuant to Mass.Gen.Laws ch. 111, § 160, codified at 310 C.M.R. §§ 22.00 *et seq.,* the DEQE's complaint alleged violations of the state's drinking water statute. More specifically, the state charged the City with repeated violations of the state turbidity MCL regulation, 310 C.M.R. 22.08(1). This state primary drinking water standard is substantially similar to the federal MCL regulating turbidity levels that is at issue in this federal enforcement action.[8]

The federal MCL for coliform bacteria, also referred to as the maximum microbiological contaminant levels, are codified at 40 C.F.R. § 141.14.

**6.** At all times relevant to the instant case, the federal requirement for repeat coliform monitoring was codified at 40 C.F.R. § 141.21(d)(1).

**7.** The account which follows is identical to the procedural history that appears in this court's January 17, 1990 Report and Recommendation Regarding Defendant's Motion to Dismiss or Stay, except that it has been updated to include subsequent developments substantiated by the expanded record now before this court.

**8.** The federal regulation, 40 C.F.R. § 141.13, is construed below at section III.B.1.

However, the parallel state court suit differs from the federal suit in several key respects. First, the state's complaint did not contain a claim for violations of the state's coliform bacteria MCL regulation, 310 C.M.R. 22.05(5). *Nor* did the DEQE seek injunctive relief for an "imminent and substantial endangerment" of the population served by the North Adams public water system, as the Government does in this case.

Indeed, the only relief initially sought by the state consisted of an injunction ordering the City to construct remedial water filtration facilities. Significantly, no interim relief was requested by the DEQE to protect North Adams consumers prior to the construction of an adequate water filtration plant.

Discovery ensued during 1987, after which the Commonwealth filed an amended complaint alleging continuing turbidity violations. DEQE then moved for summary judgment with respect to liability on both the pre- and post-September 23, 1987 violations. None of these motions had been ruled upon when the Government filed this complaint in United States District Court in March 1989.

Later that month, the City invoked the *Colorado River* abstention doctrine in an effort to persuade this court to exercise its discretionary power to dismiss or stay the federal enforcement action in light of the parallel action in state court. In its Report and Recommendation of January 17, 1990, this court urged the district court to decline to do so, concluding that "both the factual record and the procedural history of the pending state-court litigation" created substantial doubt that the state suit could pass muster as an " 'adequate vehicle for the complete and prompt' resolution of the issues raised by the parallel federal action." Report and Recommendation ("R & R") at 14.

The following factors were among those which weighed most heavily in the court's determination that neither a dismissal nor a stay was appropriate: 1) the enlarged scope of liability as well as the more comprehensive nature of the relief at issue in the federal action, R & R at 5–6 and 7–8; 2) the fact that none of the pending state court motions had been ruled upon as late as September 13, 1989, the date on which the parties to the federal dispute engaged in oral argument on Defendant's Motion to Dismiss or Stay, *id.* at 6; and 3) the fact that settlement negotiations between the City and the Commonwealth regarding the state court action, conducted from December 1987 through May 1988, had not produced any judicially enforceable results. *Id.* at 6–7.[9]

On June 7, 1990 Chief Judge Freedman issued a Memorandum and Order adopting the Report and Recommendation in its entirety and denying defendant's motion to dismiss or stay this enforcement action.

Although the City and the DEQE finally arrived at a negotiated settlement of the state civil action in August 1990, a consent decree embodying this settlement was not docketed in state court until after defendant filed its motion for summary judgment here. *See* Ware Aff. at ¶ 6 and Order dated October 11, 1990, attached as an exhibit to Supplement to Defendant's Motion for Summary Judgment (Docket # 30).

This consent decree requires the City to construct a water filtration plant capable of beginning operation on January 31, 1994. Order at ¶ 3. The decree also provides that the City must notify the DEQE and the Attorney General in the event of any delays, *id.* at ¶ 4, but that extension of deadlines may be obtained by the written stipulation of the parties. *Id.* Should the City fail to meet the terms of the decree, the Order also provides for a sliding scale of penalties, based upon the length of the period of non-compliance, which ranges

---

**9.** A judge of the Suffolk Superior Court did meet with counsel for the City and representatives of the DEQE and the EPA on January 8, 1988. At that meeting the parties to the state suit had negotiated a timetable for construction of a water filtration plant by the City. *See* Exhibit A to Defendant's Motion for Summary Judgment in the case at bar, Affidavit of Attorney Robert C. Ware ("Ware") at ¶ 4. Attorney Ware further avers that since that date, the City has been acting pursuant to the negotiated schedule. *Id.* at ¶ 5.

from a minimum of $25 per day to a maximum of $100 per day.[10] *Id.* at ¶ 6. Significantly, the decree also provides that the Commonwealth will not seek penalties for the past and future violations alleged in its complaint as long as the City remains in compliance with the terms of the order. *Id.* at ¶ 8.

### B. Summary Judgment Standard.

The basic inquiry in a summary judgment motion is whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). (Emphasis in original.)

On a motion for summary judgment, the court's function is to determine "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. (Emphasis in original.) (Citation omitted.) In assessing cross-motions for summary judgment, the evidence supporting each motion must be viewed in the light most favorable to the non-movant. Moreover, "all justifiable in-

ferences are to be drawn in [the non-movant's] favor." *Id.* at 255, 106 S.Ct. at 2513, citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–9, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

However, as Judge Selya recently emphasized:

The mere existence of a factual dispute ... is not enough to defeat summary judgment. The evidence relied upon must be "significantly probative" of specific facts, *Anderson,* 477 U.S. at 249–50 [106 S.Ct. at 2510–11], which are "material" in the sense that the dispute over them necessarily "affect[s] the outcome of the suit." *Id.* at 248, 106 S.Ct. at 2510.

*Warren B. Sheinkopf v. John K.P. Stone III, etc.,* 927 F.2d 1259, 1261–1262 (1st Cir. 1991). He also noted pointedly that courts "... cannot accept, in lieu of documented facts, conclusory assertions, or wholly anticipatory promise[s] to produce admissible evidence at trial ..." *Id.* at 1262, *quoting Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (Citations omitted).

This admonition is especially appropriate in situations such as the case at bar, where a defendant seeks to forestall summary judgment by directing the court's attention to what it might—or could—have done to avoid liability. Here, the City relies heavily upon the affidavit of a one of its employees in an effort to demonstrate that North Adams *could* have established that it was entitled to a statutory exemption from one of the SDWA regulations at issue here. Given the uncontested fact—discussed below—that the City never applied for or was granted a variance, such reliance is misplaced.

The First Circuit's warning to litigants in *Local No. 48 v. United Brotherhood of Carpenters and Joiners of America,* 920 F.2d 1047, 1051 (1st Cir.1990), bears repeating in this context:

Rule 56 does not invite a court the enter the realm of surmise. Evidence that is

---

**10.**

| Period of Failure to Comply | Penalty Per Day |
| --- | --- |
| 1st–14th day | $25.00 |
| 15th–21st day | $50.00 |
| each day thereafter | $100.00 |

The decree also sets forth the procedures governing the City's right to dispute a determination of non-compliance. Order at ¶ 6.

based on conjecture or farfetched supposition is not sufficient to derail the operation of the rule.... By the same token, "evidence [that] is merely colorable, or [ ] not significantly probative" cannot forestall summary judgment. *See Anderson,* 477 U.S. at 249–250 [106 S.Ct. at 2510–11].

### C. Facts of Record.

#### 1. *Obligations of the Parties Under Fed.R.Civ.P. 56(e) and Local Rule 56.1*

With these guidelines in place, the court will now summarize the technical facts relevant to the Government's allegations that North Adams repeatedly violated the SDWA, as set forth in plaintiff's motion for summary judgment and its supporting documents. The most important of these exhibits are the stipulations of the parties and the affidavits of J. Kevin Reilly ("Reilly"), Massachusetts Public Water System Supervision Program Coordinator for the regional office of the EPA. The City has attacked the sufficiency of Reilly's affidavits on three distinct grounds. Because the court's disposition of the parties' cross-motions for summary judgment turns to a large extent on the facts and conclusions offered in these affidavits, the court will address their validity as a threshold matter.

First, the City contends that Reilly lacks the necessary expertise to offer evidence that would be admissable at trial regarding the violations at issue here. *See* Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment at 11. Second, the City urges the court not to accept Reilly's summaries of the technical facts, and the conclusions he draws from these summaries, characterizing his calculations as confusing and his analysis of the City's bacteriological reports in particular as unsound. *See* Defendant's Response to Reply of United States to Defendant's Opposition to Motion for Partial Summary Judgment at 3–4. Finally, the City asserts that several of the exhibits from which Reilly draws his factual conclusions regarding violations of coliform bacteria MCLs at sample sites in North Adams have been altered. *Id.,* citing plaintiff's exhibits F–16–E through F–16–H, F–13–C, F–13–G, F–13–H, F–14–C through F–14–F, and F–15–B to the parties' Stipulations.

The court will dispose of these objections in reverse order. The challenged exhibits cited above consist of twelve of the Bacteriological Analysis Reports which the defendant City has admitted were prepared by it or on its behalf. The City correctly notes that on these twelve reports an unidentified hand has altered the typed designation indicating what kind of water sample was taken with respect to one or more of the sample locations. Specifically, someone has changed some of the designations from "D" (where D = "regular distribution sample") to "C" (where C = "check sample").

The materiality, if any, of these alterations to plaintiff's entitlement to summary judgment with respect to liability for violations of MCLs for coliform bacteria will be discussed more fully below at section III. B.2. For now, suffice it to say that Reilly avers that even excluding the twelve disputed Bacteriological Analysis Reports containing handwritten alterations, the remaining Reports demonstrate that the coliform MCL was exceeded for the months in question.

Regarding the first two objections, it is important to note that there are—in fact—three Reilly affidavits: one has been appended as an exhibit to the Government's Opposition to the City's Motion for Summary Judgment, a second affidavit was filed in support of the Government's Motion for Partial Summary Judgment with respect to liability, and the third was submitted in response to the defendant's objections.

The criticism of Reilly's alleged lack of qualifications as an environmental expert with specialized knowledge of water pollution verges on the frivolous. Reilly offered ample information regarding his educational and professional background in the first affidavit. Moreover, in response to defendant's challenge, this information was supplemented in his third affidavit. These three affidavits appear, respectively, as ap-

pendices A, B, and C to this memorandum. Reilly's evidence may not be rejected simply based on his alleged lack of qualifications.

With respect to the last objection as to methodology, in the third affidavit Reilly reviews his factual sources and clearly explains how he calculated what percentage of the samples used in evaluating monthly compliance exceeded maximum contaminant levels. The City cannot merely challenge these calculations via attorney argument and rest. Both the Rules of Federal Procedure and the Local Rules require more from a party opposing a properly supported motion for summary judgment.

Under Fed.R.Civ.P. 56(e), the City "may not rest upon the mere allegations or denials" of its pleading but "must set forth specific facts showing that there is a genuine issue for trial." Similarly, Local Rule 56.1—formerly Local Rule 18—provides in pertinent part that "opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, *with page references to affidavits, depositions, and other documentation.*" (Emphasis added.) The local rule also puts litigants on notice that the moving party's facts "will be deemed for purposes of the motion *to be admitted* by opposing parties unless controverted" by a properly supported statement of disputed facts. (Emphasis added.)

As will be demonstrated below, the City has largely failed, or been unable, to carry this burden with respect to its opposition to plaintiff's motion for summary judgment. Therefore, the following recitation of the facts of record will be drawn primarily from the Government's Local Rule 56.1 Statements (hereafter "LR 56.1") and its supporting exhibits.[11] Disputes will be noted to the extent that they are genuine, material, and cognizable on the record.

### 2. *Relevant Facts Regarding Applicability of—and Responsibility for Enforcing—the SDWA*

The following facts are uncontested:

1) The City of North Adams is a political subdivision of the Commonwealth of Massachusetts and is a "municipality" and a "person" within the meaning of the SDWA, 42 U.S.C. § 300f. Pl's LR 56.1 at 1, citing Stipulations at ¶ 1.

2) North Adams owns and operates a public water system, the North Adams Water Department (the "Water Department"). *Id.,* citing Stipulations at ¶ 2.

3) The Water Department supplies drinking water from three surface water supplies: the Notch Reservoir; the Mt. Williams Reservoir, and Broad Brook. *Id.,* citing [second] Reilly Aff. at ¶ 19.

4) The Water Department has approximately 4,300 service connections and regularly serves approximately 16,000 residents. *Id.,* citing Stipulations at ¶ 3.

5) The Commonwealth has primary responsibility for enforcement of drinking water regulations within its borders. Def's LR 56.1 at 1, citing Complaint at ¶ 8.

6) On March 7, 1986 the Administrator of the EPA, through his delegatee the Regional Administrator for Region I, notified the Commonwealth and the North Adams Water Department that the Water Department was in violation of federal and state primary drinking water standards. Pl's Opp. LR 56.1 at 1, citing first Reilly Aff. at ¶ 5 and Exhibit 1 to Reilly Aff. (Letter to Russell Sylvia, Commissioner of the Massachusetts DEQE, from Paul Keough, Acting EPA Regional Director, dated 3/7/86).

7) The Commonwealth did not commence enforcement action against the City with respect to these violations of drinking water standards until April 29, 1987, more than 30 days after the Administrator of the EPA notified the state of the violations.

---

**11.** Because these are cross-motions for summary judgment, each party has submitted two LR 56.1 statements, one in support of its own motion for summary judgment and one in opposition to its adversary's motion for summary judgment. For ease of reference, the court will refer to these in abbreviated form as Def's LR 56.1, Def's Opp. LR 56.1, Pl's LR 56.1, and Pl's Opp. LR 56.1.

*Id.,* citing Exhibit B to Defendant's Motion for Summary Judgment (Copy of Complaint filed by the DEQE); Def's LR 56.1 at 1–2, citing Defendant's Exhibits A (Ware Affidavit) and B (Copy of Complaint filed by DEQE).

### 3. *Alleged Violations of MCL for Turbidity*

The City concedes that it has never applied for—or been granted—a turbidity variance or an exemption from the DEQE, as prescribed in Part 310 of the Code of Massachusetts Regulations, §§ 22.13(6) and 22.14(7). Pl's LR 56.1 at 2, citing Stipulations at ¶ 5 and Pl's Exhibit B (Defendant's Response to Request for Admissions) at ¶¶ 30, 31, 32, and 33. Notwithstanding these admissions, North Adams attempts to create a disputed issue of material fact by asserting that it *could* make the prerequisite factual showing mandated by these regulations *if* given an opportunity to do so by the DEQE.

More specifically, defendant maintains that it "can demonstrate that turbidity in the city's water system does not 1) interfere with disinfection; 2) prevent maintenance of effective disinfectant agent [sic] throughout the distribution system; or 3) interfere with microbiological determinations." Def's Opp. LR 56.1 at ¶ 2, citing Plaintiff's Exhibit 4, Deposition of Genesio Breda (former Commissioner of the Defendant's Department of Public Services)[12] [no page numbers are cited]. Similarly, the defendant answered "Admitted in part; denied in part" to Government Request for Admissions # 27–29, which state that the Commonwealth has not made any of the above determinations and has not granted the defendant either an exemption or a variance from the state turbidity MCL. Plaintiff's Exhibit 1.

As indicated above, surmise or conjecture regarding what the City might have been able to establish had it properly sought a variance—or had it appealed a denial by the DEQE via administrative or judicial channels—cannot forestall summary judgment with respect to liability. Moreover, the excerpts from Breda's deposition place the final nail in the coffin of defendant's *post hoc* attempt to achieve such an exemption, even if this court were empowered to grant one, which it is not.[13]

First, Breda's testimony makes it clear that he was aware that an exemption from the turbidity MCL could be secured only with the approval of the DEQE, Breda Dep. at 26–28, that he thought the defendant's Water System was entitled to such an exemption, *id.* at 38, but that he never formally applied for one because on several occasions a DEQE official flatly stated that "You'll never get it." *Id.* at 39 and 98.

Breda also states that, given the DEQE's unwavering opposition, nothing more than a "sort of a half-hearted attempt" was made to set in motion the "initial stages of demonstrating" that the system was "okay." *Id.* at 99. Finally, and perhaps most damaging to the City's position, is the affidavit itself. Breda specifically avers that:

> The City on several occasions has sought to demonstrate to D.E.Q.E. that the turbidity does not interfere with disinfection with its new state-of-the-art chlorination facilities. D.E.Q.E. officials have refused to permit the City to make that demonstration and have insisted that the City is in violation of D.E.Q.E. regulations whenever turbidity levels exceed one turbidity unit (1NTU).[14]

---

12. The Breda Affidavit cited by defendant actually appears as an exhibit attached to excerpts from Breda's deposition, submitted as Plaintiff's exhibit 4. This affidavit, dated December 16, 1987, was originally submitted by Breda as part of the state court proceeding. The Department of Public Services includes management of the water system. Breda, who apparently retired in January 1990, had formerly served as City Engineer. Breda Dep. at 7.

13. *See* discussion below at Section III. B.

14. The one unit state maximum is identical to the federal MCL for turbidity, as discussed below in Section III. B.

Plaintiff's Exhibit 4, Breda Aff. at ¶ 2. *See also* Plaintiff's Exhibit 5 (Deposition of Mayor John Barrett) at 49–50.

Citing North Adams' Response to Request for Admissions in the state court action, the Government states that between August 1978 and April 1989, the monthly average turbidity levels of water samples taken from defendant's three surface water supplies repeatedly exceeded 1.0, the maximum permissible level for a public water system which has not received a variance. Pl's LR 56.1 at ¶ 11. The Government also asserts that more recent turbidity reports produced by North Adams in response to plaintiff's request for production of documents in this case indicate additional violations for several of the months between June 1989 and May 1990. *Id.* at ¶ 12. Finally, the Government asserts that the two-day average turbidities of some samples taken from these water supplies ranged between 5.15 and 8.7 turbidity units during April of 1987. *Id.* at ¶ 13, citing Stipulations and Defendant's Response to Requests for Admissions at ¶¶ 43–49, 55–57, and 63–65.

For its part, the City merely contends that "the average monthly turbidity of the city's water system has not exceeded 1.0 turbidity unit [the federal and state MCL]." Def's Opp. LR 56.1 at ¶ 1. However, North Adams fails to cite any affidavit, deposition, or document in support of this contention.[15]

Instead, North Adams attacks both the constitutionality and the Government's interpretation of the federal regulation governing turbidity levels, 40 C.F.R. § 141.13. Because the City has not disputed the factual accuracy of the above-cited reports, the plaintiff's entitlement to summary judgment with respect to these alleged turbidity violations turns solely on the success or failure of defendant's attempt to persuade this court that the regulation is unconstitutionally vague or, in the alternative, that the Government has misconstrued § 141.13. There is no adequately supported *factual* dispute.

4. *Alleged Violations of Coliform Bacteria MCL*

With respect to coliform bacteria, the Government cites the following Bacteriological Analysis Reports, prepared by or on behalf of the City and utilizing the requisite membrane filtration method of analysis, as evidence that the City repeatedly violated the relevant MCL, 40 C.F.R. § 141.14:

a) forty-eight water samples collected from the City's water system in October 1986, Pl's LR 56.1 at ¶ 15, citing Stipulations and Defendant's Response to Request for Admissions at ¶ 68;

b) forty-eight water samples collected from the City's water system in August 1986, *Id.*, citing Stipulations and Defendant's Response to Request for Admissions at ¶ 71;

c) thirty-seven water samples collected from the City's water system in November 1985, *Id.*, citing Stipulations and Defendant's Response to Request for Admissions at ¶ 75;

d) forty-eight water samples collected from the City's water system in October 1985, *Id.*, citing Stipulations and Defendant's Response to Request for Admissions at ¶ 79; and

e) forty-eight water samples collected from the City's water system in July 1985,

---

**15.** The City does, however, append the affidavit of Richard R. Boucher ("Boucher"), the general foreman of the North Adams Water Department. Boucher avers that he had "several conversations" with Reilly during visits made by Reilly to North Adams. On one such occasion, Reilly allegedly advised him that: 1) turbidity levels should be reported to the second decimal point, and 2) a turbidity level of 1.4 or less did not constitute a violation of the federal turbidity regulation. Boucher Aff. at ¶¶ 2–3. Boucher also states that based on his "personal measurements of turbidity levels" and his "personal review" of turbidity reports, he knows that there have been "a number of occasions when the turbidity at one of the City of North Adams' surface water sources was between 1.0 and 1.4 turbidity units." *Id.* at ¶ 4. Because no specific dates, water sources, or reports are referred to, defendant's reliance on this exhibit is unavailing. Boucher's affidavit does not conform to LR 56.1 in that it fails to controvert any of the specific facts relied on by the Government with respect to violations of the turbidity MCL.

*Id.*, citing Stipulations and Defendant's Response to Request for Admissions at ¶ 84.

According to the second Reilly affidavit, in each of these months more than 5% of the samples contained more than four coliform bacteria per 100 milliliters, in violation of the applicable MCL. Pl's LR 56.1 at ¶ 20, citing Plaintiff's exhibit 2 at ¶¶ 3–18. [Attached as appendix B to this memorandum.]

As noted above, after defendant challenged the methodology used by Reilly to arrive at this conclusion and pointed to handwritten alterations of the code distinguishing "regular distribution" samples from "check" samples, Reilly submitted a third affidavit. After explaining how he arrived at the 5% violation figure for each of the above 5 months, Reilly acknowledges having made "some minor mathematical and typographical errors" in his second affidavit. But he avers that these errors "do not substantially affect the results." Exhibit 2 to Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶ 6.

In opposition to this conclusion, the City has offered two facts of record concerning the city census for 1985 and 1986. Mary Ann Abuisi ("Abuisi"), the defendant's City Clerk, states that North Adams' population for those years was 15,742 and 16,434, respectively. Abuisi Aff. at ¶ 2. Relying only on these figures, defendant takes aim once again at Reilly's calculations, offering attorney argument that runs as follows: the City took more samples than was legally required by the Act;[16] therefore, the monthly coliform averages as computed by Reilly in his affidavits are unreliable because they fail to segregate routine samples from check samples. *See* Defendant's Memorandum in Opposition to Summary Judgment at 11–12.

Defendant has not offered any facts of record to indicate what the "correct" calculation should be, or whether that calculation would conform to the applicable MCL. Moreover, in his third affidavit Reilly recalculates the averages twice. Plaintiff's Exhibit 2 at ¶¶ 4–5. The first recalculation is based upon the corrected figures for *all* of the Reports cited above. *Id.* at ¶¶ 7–29. The second excludes the samples reported as "check" samples from the total, in compliance with 40 C.F.R. § 141.21(d)(4). Both recalculations enable Reilly to state unequivocally that "the conclusion that North Adams violated the MCL at 40 C.F.R. § 141.14(a)(3) is not changed." *Id.* at ¶ 5.

Finally, Reilly indicates that he performed a third calculation in which he ignored the handwritten designations and used the original typed designations on the altered Reports. While conceding that this would change the above percentages, Reilly emphasizes that "the fact of the violations would not change." *Id.* at ¶ 30. In sum, "the bottom line is that no matter how one does the calculation, the [coliform] MCL was exceeded." *Id.* The City has offered no facts of record to contradict this conclusion.

5. *Alleged Violations of Coliform Bacteria Monitoring Requirements*

The Government also asserts that on ten occasions in 1985 and 1986, North Adams failed to comply with the coliform monitoring provision of the Act. This provision requires that two consecutive daily check samples be collected from any sampling point when the coliform bacteria in a single sample taken pursuant to § 141.12(a) has exceeded four per 100 milliliters.

Citing the Stipulations and Defendant's Response to Request for Admissions at ¶¶ 87–106, plaintiff asserts that check samples should have been, but were not, taken for the following dates and locations:

---

**16.** 40 C.F.R. section 141.21 sets forth a sliding scale of the minimum number of routine samples that must be taken per month, based on a city's population.

| Date of Original Sample | Sample Location | Coliform per 100 Milliliters in Original |
|---|---|---|
| 10/18/85 | Doran's Bar | 9 |
| 10/18/85 | Adams Nursing Home | 25 |
| 11/15/85 | City Hall | 6 |
| 11/15/85 | Texan Restaurant | 5 |
| 11/15/85 | Rock Manor Mobile Park | 5 |
| 10/1/86 | Chaput's Market | 7 |
| 10/1/86 | Doran's Bar | 10 |
| 10/1/86 | Brother's Store | 8 |
| 10/1/86 | Rock Manor Mobile Park | 12 |
| 10/1/86 | East School | 6 |

Pl's LR 56.1 at ¶ 21.

---

6. *Relevant Facts Regarding North Adams' Contention That There is No Basis to Conclude that Its Water System Presents, or May Present, an Imminent and Substantial Endangerment to Water Consumers' Health*

In support of its contention that the Government can no longer maintain this federal enforcement action because it lacks evidence of an "imminent and substantial endangerment" of public health, North Adams emphasizes that the plaintiff has not sought a temporary restraining order or a preliminary injunction since this action was commenced in March of 1989. The City also relies heavily upon the procedural history of the parallel state action, especially the recent progress made in arriving at a judicially enforceable timetable for the construction of a filtration facility. *See* Defendant's LR 56.1 in its entirety.

North Adams further offers its attorney's statement that he is unaware of: 1) any request made by the Governor or the Massachusetts DEQE to the EPA to commence a civil action against the City or 2) any evidence of the plaintiff's which suggests that any person has become ill as a result of contaminants in defendant's water system. Ware Aff. at ¶ 7. Finally, North Adams cites the deposition of Bernard K. Birkland ("Birkland"), defendant's Sanitarian and Health Director, as evidence that no illness has yet been caused to any person as a result of any contaminant in the City's water system. *See* Defendant's Memorandum in Support of Motion for Summary Judgment at 6, citing Defendant's Exhibit D (Birkland Deposition Excerpts) [no page citations].[17]

In support of its contention that the City's non-compliance with the SDWA may well pose an "imminent and substantial 7 endangerment" to the health of citizens who rely on defendant's water system, the Government asserts the following facts:

a) The water for the North Adams Water Department is supplied by four unprotected surface water sources [18] and two standby groundwater sources. The only water treatment provided by the Water Department is simple chlorination. However, the system does not provide sufficient chlorine contact time, active watershed protection, rapid mix, flocculation,[19] sedimentation [20] or filtration.[21] Pl's Opp. LR 56.1 at

17. The deposition excerpts cited by North Adams are actually somewhat ambiguous on this point. Birkland indicates that some Giardia tests were done after the City became alarmed about reports of waterborne diseases, but that the tests came back negative. Birkland Dep. at 43–46.

18. Reilly has apparently included the Mt. Greylock reservoir to arrive at a total of four such sources.

19. "Flocculation" means a process to enhance agglomeration or collection of smaller floc particles into larger, more easily settleable particles through gentle stirring by hydraulic or mechanical means. 40 C.F.R. § 141.2.

20. "Sedimentation" means a process for removal of solids before filtration by gravitation or separation. 40 C.F.R. § 141.2.

21. "Filtration" means a process for removing particulate matter from water by passage through porous media. 40 C.F.R. § 141.2.

¶ 3, citing [first] Reilly Aff. ("Reilly Aff. # 1") at ¶ 6.

b) Pathogens [22] may be contained in particulate matter. Turbidity measures particulate matter.[23] North Adams has repeatedly violated the MCL for turbidity and such violations are likely to recur. *Id.* at ¶ 4, citing Reilly Aff. # 1 at ¶ 7.

c) One mode of introduction of pathogens to water is by the excrement of animals. Animal feces contribute to the turbidity of water, especially during rainstorms as the feces are broken up and can be washed into surface water supplies. *Id.*

d) Wild animals and humans frequent the watersheds around North Adams' surface water supplies. *Id.* at ¶ 5, citing Deposition of Norman DeGrenier (caretaker of Broad Brook Reservoir) at 14–19 and 24 (Plaintiff's Exhibit 2 to Opposition to Defendant's Motion for Summary Judgment) and Deposition of Mark Thomann (caretaker of Mt. Williams Reservoir) at 32–39 (Plaintiff's Exhibit 3 to Opposition to Defendant's Motion for Summary Judgment).

e) Increased turbidity may shield pathogens from the disinfection process and may reduce the amount of effective chlorine available to disinfect the water. *Id.* at ¶ 6, citing Reilly Aff. # 1 at ¶ 8.

f) The Water Department has no watershed control program to minimize the potential for contamination. *Id.* at ¶ 7, citing Reilly Aff. # 1 at ¶ 9.

g) North Adams provides insufficient chlorine contact time to insure disinfection of disease causing micro-organisms in its Water System prior to ingestion of water by consumers. *Id.* at ¶ 8, citing Reilly Aff. # 1 at ¶ 10.

h) The Water Department also lacks sufficient long-term storage capacity to provide adequate detention time for the settling of particulate matter in its water supply. *Id.* at ¶ 9, citing Reilly Aff. # 1 at ¶ 11.

i) Because portions of the defendant's Water Department facilities are more than 70 years old and the system operated without appropriate chlorination facilities for many of those years, micro-organisms are seeded in the distribution system. These micro-organisms may interfere with the detection of coliform bacteria in the water system. *Id.* at ¶ 10, citing Reilly Aff. # 1 at ¶ 12.

j) *Giardia*—a one-cell pathogenic protozoan—inhabits the digestive tract of mammals and is transmitted in its cyst stage from mammal to mammal via the fecal-oral route. The excreted fecal matter may then be transmitted to bodies of water. If not properly treated, drinking water derived from a water source that contains such fecal matter may cause giardiasis. *Id.* at ¶ 11, citing Reilly Aff. # 1 at ¶ 13.

k) *Giardia* causes giardiasis, a disease characterized by diarrhea, nausea, cramps, bloating, vomiting, loss of appetite, loss of weight and occasionally fever. Giardiasis, one of the most commonly reported waterborne diseases in the United States, is associated with unfiltered water supplies in water systems which have not adequately treated their drinking water. *Id.*

l) The combination of repeated turbidity violations, an unfiltered water supply, an unprotected watershed area, the lack of long-term storage capacity, micro-organisms seeded in the distribution system, the possible shielding of pathogens by excessive turbidity or reduction of the amount of effective chlorine as a disinfectant agent, and insufficient disinfectant contact time constitutes an ongoing public health threat to North Adams water users. *Id.* at ¶ 12, citing Reilly Aff. # 1 at ¶ 14.

m) Contaminants which are present in— or are likely to enter into—the North Adams Water System may be found to present an imminent and substantial endangerment to the health of its customers. *Id.* at 13, citing Reilly Aff. # 1 at ¶ 15.

---

**22.** Pathogens are disease causing agents, such as bacteria or fungi. *The American Heritage Dictionary,* 2nd ed. at 910.

**23.** *See* note 4, *supra.*

## III. DISCUSSION

A. Defendant's Motion for Summary Judgment.

Relying in large part on arguments similar to those it made in its unsuccessful effort to persuade this court to dismiss or stay the federal enforcement action in light of the parallel state suit, North Adams contends that it is entitled to summary judgment with respect to both of plaintiff's claims for relief. More specifically, the City maintains that the Government lacks authority to bring this action under either section 300g–3(b) (First Claim for Relief) or section 300i of the Act (Second Claim for Relief). These arguments remain unpersuasive for the reasons set forth below.

1. *Arguments Regarding Plaintiff's First Claim for Relief*

As the Government notes, North Adams has offered what amounts to a jurisdictional challenge to plaintiff's First Claim for Relief (*see* Complaint, First Claim for Relief), brought pursuant to 1414(b) of the Act, 42 U.S.C. § 300g–3(b). Having considered these arguments carefully, the court must conclude that defendant's interpretation of the jurisdictional prerequisites of the Act is wrong as a matter of law.

Section 300g–3(b) authorizes the Administrator of the EPA to bring a civil action in United States district court in order to achieve compliance with the SDWA under the conditions set forth in § 300g–3(a)(1) of the Act. These provisions govern situations where, as here, a state has primary enforcement responsibility for ensuring that its public water systems comply with national primary drinking water standards. This section requires that the Administrator must first notify the State and the public water system of any non-compliance. The state then has 30 days either to bring the system into compliance with the regulations or to commence an "appropriate" enforcement action.

This section further provides in pertinent part:

If, *beyond the thirtieth day after the Administrator's notification* ... the State has not commenced appropriate enforcement action, the Administrator shall issue an order under subsection (b) of this section requiring the public water system to comply with such regulation or requirement *or* the Administrator shall commence a civil action under subsection (b) of this section.

§ 300g–3(a)(1)(B). (Emphasis added.) Here, it is undisputed that the EPA notified both Commonwealth and the City of non-compliance on March 7, 1986, that the DEQE did not institute a civil action in state court until April 29, 1987, well over thirty days after the EPA notification, and that the EPA did not file this suit until March of 1989.

Citing this chronology, North Adams attempts to construe this subsection as a statute of limitations barring the instant federal action. The City's argument is that the provision requires not the state but the EPA to commence an "appropriate" enforcement action *within thirty days*. The court agrees with the plaintiff that Congressional intent with regard to this subsection was to provide the Government with the option of judicial action should the delegated state fail to take appropriate enforcement action within 30 days. *See United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1002 (9th Cir.1980) (construing a similar provision in the Clean Water Act as a thirty-day waiting period for the EPA).

In addition, even if state action had been commenced within the prescribed 30 days, the City would still not be able to meet its burden of demonstrating that the state suit was, or is, indisputably an "appropriate" action within the meaning of the statute, given the procedural and factual record before this court. Indeed, except for the additional facts involving the execution and terms of the consent decree, the City's contentions here with respect to the appropriateness of the state action amount to nothing more than a recycling of its unsuccessful argument in support of its motion to dismiss or stay the federal enforcement action.

While the recent docketing of a consent decree does indicate that significant progress has been achieved in the parallel state action, such progress is not disposi-

tive. Viewing the facts in the light most favorable to the Government, it is undisputed that the consent decree does not address all of the violations and issues raised by the pending federal action. Moreover, the Government seeks more stringent, but not conflicting, relief. *See United States v. Cargill, Incorporated,* 508 F.Supp. 734, 740 (D.Del.1981) (emphasizing that diligence as well as appropriateness are key factors to consider when evaluating parallel state and federal actions under the Clean Water Act).

Finally, the Government notes that the stipulated penalties for non-compliance with this consent decree are significantly lower than the $1000 per day fines stipulated by the parties in other cases brought by the state against municipalities for violations of other environmental standards.[24] Plaintiff urges this court to draw the not unreasonable inference that—absent the federal enforcement action—North Adams would have little financial incentive to adhere to the timetable, especially in light of the relatively greater costs of financing the proposed filtration plant.[25]

Equally compelling are the Government's two arguments regarding the procedural history of the two suits, especially the timing of North Adams' decision to cooperate with the state by entering into a judicially enforceable consent decree. *See Brewer v. City of Bristol,* 577 F.Supp. 519, 527–528 (E.D.Tennessee 1983) (diligence of prosecution of state enforcement effort must be balanced against timing, especially where state effort was not instituted promptly). When viewed in the light most favorable to the non-moving party, this sequence of events raises a reasonable inference that the City's belated willingness to enter into a binding consent decree in August 1990 (only after Chief Judge Freedman adopted this court's Report and Recommendation

not to stay or dismiss the federal enforcement action) may well have been the result of pressure generated by this action.

Moreover, as the Government correctly asserts, facts relevant to jurisdiction are properly determined as of the time of filing of the federal complaint. *See, e.g., Chesapeake Bay Foundation v. Gwaltney,* 890 F.2d 690, 693–94 (4th Cir.1989). The "appropriateness" *vel non* of the state action should not be measured by progress achieved almost four years after it was initiated and two years after the filing of the parallel federal action. In sum, the jurisdictional attack on plaintiff's first claim for relief must fail.

*2. Arguments Regarding Plaintiff's Second Claim for Relief*

Equally unavailing is the City's contention that it is entitled to summary judgment under § 300i of the Act because the Government has not sought a temporary restraining order or a preliminary injunction. This section, which sets forth the EPA's Emergency Powers under the SDWA, permits—but does *not* require— the Administrator to seek a "restraining order *or* permanent *or* temporary injunction" as one of the actions authorized against "imminent and substantial endangerment" to health. 42 U.S.C. § 300i(a)(2). (Emphasis added.)

Similarly, the City's construction of the phrase "imminent and substantial endangerment" as requiring a showing of a) actual harm in the form of reports of human illness, rather than the risk of such harm and b) imminent harm in the sense of "immediate" harm, is unpersuasive and unsupported by either legal authority or the legislative history of the Act. Indeed, excerpts from the legislative history of Section 1431 of the Act cited by the Government indicate that the opposite is true.

---

**24.** The Government has submitted four examples of consent decrees, entered into in 1987–88 and offered as plaintiff's Exhibits 4–7.

**25.** According to the Government's computations, the maximum *yearly* penalty provided for under the consent order docketed in the state court action would amount to $36,500, while the cost of borrowing the $5 million necessary to

build the facility could reach well over $250,000 in interest alone. *See* Plaintiff's Memorandum in Opposition to Summary Judgment at 13, n. 4. The conservative $5 million figure is derived from the deposition testimony of Mayor Barrett at 92–83. The Mayor actually indicated that the cost could reach $7 million. *Id.*

Specifically, these excerpts state that "... while the *risk* of harm must be 'imminent' for the Administrator to act, the harm itself need not be." Plaintiff's Memorandum in Opposition to Summary Judgment at 15–16, citing House Rep. No. 93–1185 at 35–36. (Emphasis added.) "Thus ... the Administrator may invoke this section when there is an *imminent likelihood* of the introduction into drinking water of contaminants that *may* cause health damage *after a period of latency.*" *Id.* (Emphasis added.)

Similarly, the City offers no authority in support of its contention that actual reports of human illness are required to establish the presence of a "substantial" endangerment to water consumers. Again, an excerpt from the legislative history offered by the Government lists the following as "among those situations" in which the endangerment may appropriately be regarded as "substantial" within the meaning of the SDWA:

> (1) a substantial likelihood that contaminants capable of causing adverse health effects will be ingested by consumers if preventive action is not taken; (2) a substantial statistical probability that disease will result from the presence of contaminants in drinking water; *or* (3) the threat of substantial or serious harm (such as exposure to carcinogenic agents or others hazardous contaminants).

*Id.* (Emphasis added.)

Plaintiff cites two cases which construe the term "imminent and substantial endangerment" under the SDWA and other environmental statutes. Both indicate that what must be imminent is not the actual harm itself but the risk of harm if remedial action is not taken. *See United States v. Price,* 688 F.2d 204, 213–214 (3rd Cir.1982) and *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 191–197 (W.D.Mo. 1985).

In light of the evidence offered by the Government with respect to the substantial endangerment issue, the City has failed to carry its burden of demonstrating that undisputed facts entitle it to summary judgment as a matter of law with respect to plaintiff's second claim for relief.

To conclude, the court finds that on the record before it the defendant is not entitled to summary judgment with respect to plaintiff's first or second claims for relief.

**B. Plaintiff's Motion for Summary Judgment With Respect to Claim One.**

The Government argues that it is entitled to summary judgment as a matter of law under §§ 300f–300j–11 of the SDWA with respect to the City's liability for repeated violations of the Act's MCLs for turbidity and coliform bacteria as well as the SDWA's coliform bacteria monitoring requirements. For the reasons set forth below, this court agrees that, even when the record is viewed in the light most favorable to the City and all reasonable inferences are drawn in the City's favor, North Adams cannot carry its burden of establishing that a genuine and material issue of disputed fact precludes summary judgment on plaintiff's first claim for relief.

*1. Alleged Turbidity Violations.*

The City seeks to avoid summary judgment with respect to liability for continued violations of the federal turbidity MCL by attacking the Government's interpretation of the regulation, by attempting to challenge the validity of the regulation and by asserting that—even if the regulation is valid and the Government has properly construed it—North Adams escapes liability because it is entitled to a variance or exemption from the prescribed MCL. Significantly, the City does not otherwise dispute the facts offered by the Government in support of its motion. The City's three grounds for avoiding liability for the alleged turbidity violations will be addressed *seriatim.*

40 C.F.R. § 141.13, the federal regulation setting forth the applicable turbidity MCL, reads as follows:

> The maximum contaminant levels for turbidity are applicable to both community water systems and non-community water systems using surface water sources in whole or in part. The maximum con-

taminant levels for turbidity in drinking water, *measured at a representative entry point(s)* to the distribution system, are:

(a) One turbidity unit (TU), as determined by a *monthly average* pursuant to § 141.22, *except that five or fewer turbidity units may be allowed if the supplier of water can demonstrate to the state* that the higher turbidity does not do any of the following:

(1) Interfere with disinfection;

(2) Prevent maintenance of an effective disinfectant agent throughout the distribution system; or

(3) Interfere with microbiological determinations.

(b) Five turbidity units based on an average for two consecutive days pursuant to § 141.22.[26]

(Emphasis added.)

The City reads this regulation as requiring the Government to establish a monthly average turbidity exceeding one TU for the *entire* water system, rather than for discrete ground water sources within that system. Noting that the Government has not established monthly turbidity figures for every single supply source for every single month in question, the City therefore contends that the Government has failed to establish that the entire system was in violation for any month but April 1987. *See* Defendant's Memorandum in Opposition to Summary Judgment at 3–4.

The Government responds by pointing to the text of the regulation, which states that turbidity is to be measured "at a representative entry point(s) to the distribution system," and by asserting that compliance must be determined at the point or points of entry, not throughout the system as a whole. The Government's construction of the regulation is further bolstered by the regulatory definition of "maximum contaminant level," *supra* n. 3, which expressly directs that turbidity levels be measured not at the point of delivery to the user but at the point[s] of entry into the distribution system.[27]

Moreover, the court agrees with the Government that, having taken such samples *pursuant to* the applicable federal and state regulations, the City should not now be heard to complain that such samples are not valid evidence of violations of these very regulations.

Nor is the City any more persuasive with respect to its contention that § 141.13 itself is invalid, ambiguous or unconstitutionally vague. *See* Defendant's Memorandum in Opposition to Summary Judgment at 4–7.

First, the Government correctly notes that § 1448(a) of the SDWA, 42 U.S.C. § 300j–7(a), sets forth the required procedure for challenging a primary drinking water regulation once it has been promulgated by the EPA. In pertinent part, this section provides that "[a]ction of the Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceedings for enforcement or in any civil action to enjoin enforcement."

Second, the Court of Appeals for the District of Columbia has exclusive jurisdiction over challenges to the validity of these regulations. *See Halogenated Solvents Industry Alliance v. Thomas*, 783 F.2d 1262 (5th Cir.1986). North Adams is therefore precluded from attempting to use the instant enforcement action as a vehicle to mount a belated challenge to the validity of § 141.13.

Finally, defendant's contention that the Government has the burden of establishing that the higher five TU provision of § 141.13 does *not* apply here is unavailing. As the Government correctly maintains, the plain language of the regulation indicates that the five TU provision becomes operative only if—and when—the *supplier* makes the requisite demonstration *to the*

---

**26.** Section 141.22 prescribes the sampling method to be used.

**27.** The logic for measuring turbidity levels at the point[s] of entry into the distribution system is further underscored by the facts of the case at bar. The three surface water supplies in use by the defendant during the time periods relevant to this action service *different* areas of the City. *See* Plaintiff's Memorandum at 3, citing Boucher Dep. at 17–21, and 28–29.

*state.* Moreover, the EPA's interpretation of the statutory scheme "is entitled to some deference." *Halogenated Solvents,* 783 F.2d at 1265.

Even were this not the case, the evidence relied on by North Adams regarding its ability to make such a showing ironically undermines its position. Section 141.4 expressly provides that variances or exemptions may be granted pursuant to §§ 1415 and 1416 of the Act only "by the entity with primary enforcement responsibility." It is uncontested that the Commonwealth is that entity in the case at bar. Breda's affidavit as well as his deposition testimony make it clear not only that the state failed to grant the City a variance or exemption but also that the defendant failed even to *apply* properly for such a variance or exemption. *See* 42 U.S.C. §§ 300g–4 and 300g–5, prescribing the procedure for application to a state for a variance or an exemption, respectively.[28]

This court concludes that—on the basis of the undisputed facts regarding defendant's repeated violations of the turbidity MCL—the Government is entitled to summary judgment with respect to liability under § 141.13 of the SDWA as a matter of law.

### 2. Alleged Coliform Bacteria Violations.

The Government next asserts that it is entitled to summary judgment as a matter of law with respect to the coliform bacteria MCL violations alleged in Reilly's affidavits. Section 141.14(a)(3) reads as follows:

The maximum contaminant levels for coliform bacteria, applicable to community water systems and non-community water systems, are as follows:

(a) When the membrane filter technique pursuant to § 141.21(a) is used, the number of coliform bacteria shall *not exceed any of the following:*

. . . . .

(3) Four per 100 milliliters *in more than five percent* of the samples *when 20 or more* are examined per month.

(Emphasis added.)

As noted above, the City has challenged Reilly's qualifications as well as his method of determining what percentage of the samples exceeded four per 100 milliliters. However, with one exception, North Adams has not disputed the accuracy of the underlying bacteriological reports: it takes issue only with Reilly's reliance on the twelve reports which contain handwritten alterations.

40 C.F.R. § 141.21(d)(4) states that determinations of compliance with 141.14 must be based on results "from *all* coliform bacteria analyses performed pursuant to this sub-part," except for "check samples" or "special purpose samples." (Emphasis added.) As previously noted, in accordance with § 141.21(d)(4) Reilly recalculated the averages twice. First, he excluded all samples recorded as check samples from his computations. Then he ignored the handwritten alterations and recalculated the percentages.

All three calculations demonstrate that for each of the months at issue here: 1) more than 20 regular samples were examined and 2) more than 5% of these routine samples exceeded 4 coliform bacteria per 100 milliliters. Based on Reilly's uncontested affidavits, this court finds as a matter of law that North Adams violated § 141.14 for the following months: October 1986; August 1986; November 1985; October 1985; and July 1985.

### 3. Alleged Violations of the SDWA's Coliform Monitoring Requirements.

The Government also asserts that North Adams failed to comply with the Act's coliform bacteria monitoring provisions on ten occasions during 1985 and 1986. The version of 40 C.F.R. § 141.21(d)(1) in effect prior to December 31, 1990, reads as follows:

When the coliform bacteria in a single sample *exceed four per 100 milliliters* (§ 141.14(a)), *at least two consecutive daily check samples shall be collected* and examined from the *same* samples

---

**28.** Section 300j–7(b)(1), which governs judicial review of actions respecting variances and ex-emptions, only becomes operative once a variance or exemption has been granted or refused.

point. Additional check samples shall be collected daily, or at a frequency established by the State, until the results obtained from at least two consecutive check samples show *less than one* coliform bacterium per 100 milliliters.

(Emphasis added.)

The City does not contest these alleged violations. Instead, North Adams states in conclusory fashion that the EPA lacks authority to promulgate such requirements. Moreover, North Adams contends that even if such authority exists, the EPA may not subject water suppliers to civil penalties for violations of this provision.

No caselaw has been cited by either party on this issue, but the Government has offered persuasive excerpts from the legislative history of the Act as well as the SDWA's definitional section in support of its entitlement to seek civil penalties for monitoring violations. Specifically, plaintiff maintains that when Congress authorized the EPA to formulate "national drinking water regulations," this authorization extended not only to the establishment of MCL's but also to the establishment of "criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including *quality control* and *testing procedures* to insure compliance with such levels. . . ." 42 U.S.C. § 300f(1)(D). (Emphasis added.) *See* Plaintiff's Memorandum in Support of Summary Judgment at 9–10.

Under § 300g–3(b) of the Act, which authorizes the EPA to seek civil penalties by bringing suit under the Act, a court is authorized to impose civil penalties if it determines "that there has been a violation of the regulation or schedule or other requirement with respect to which the action was brought. . . ." Citing this section, the Government maintains that courts may assess a civil penalty "for each day" in which

North Adams violated the monitoring regulation.

The court's research has turned up one case and two docketed consent decrees that support the Government's contention that a failure to perform sampling required by the Act can trigger the imposition of civil penalties. *See, United States of America v. Alder Creek Water Company*, Civil Action No. 79–1090–JU (April 26, 1984 D. Oregon), 21 ERC (BNA) 1300; *United States of America v. Boca Chica Water Supply, Inc.*, 1989 EPA Consent Lexis No. 7 (July 12, 1989 S.D.Tex.); and *United States of America v. Town of Bolton, Mississippi*, 1989 EPA Consent Lexis No. 45 (March 15, 1989 S.D.Miss.). It is noteworthy, however, that violations of SDWA regulations involving the failure to take required samples have been viewed as less serious than violations of MCL regulations and have therefore resulted in comparatively lower fines. *See Alder Creek, supra.*

The City's final attempt to evade liability turns once again on its contention that even if such violations occurred, the parallel state action precludes the instant federal enforcement action because the state action has already "resolved" the issues. The court remains unpersuaded and concludes that the Government is entitled to summary judgment as a matter of law with regard to the City's violations of the SDWA's coliform bacteria monitoring requirements.

## IV. CONCLUSION

For the foregoing reasons, this court hereby recommends that the defendant's Motion for Summary Judgment be DENIED and that the plaintiff's Motion for Partial Summary Judgment with respect to liability on its first claim for relief be ALLOWED.[29] The court recommends that

---

**29.** The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection thereto with the Clerk of this court *within ten (10) days* of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appel-

the district court issue the plaintiff's proposed order, which is attached as Appendix D.

late review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See U.S. v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir.1986); *U.S. v. Escoboza Vega*, 678 F.2d 376, 379 (1st Cir.1982).

*See also, Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 474–75, 88 L.Ed.2d 435 (1985).